# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.              Case No. 09-CR-118

**JOHN HOCHREK**
   **Defendant.**

## SENTENCING MEMORANDUM

Defendant John Hochrek pleaded guilty to an information charging him with conspiracy to commit wire fraud, contrary to 18 U.S.C. §§ 371 & 1343, and I set the case for sentencing. In imposing sentence, the district court must first calculate the defendant's advisory sentencing guideline range, then determine the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010).

### I. GUIDELINES

The parties agreed to a base offense level of 6, U.S.S.G. § 2B1.1(a)(2), with enhancements of 18 levels based on the loss amount,[1] § 2B1.1(b)(1)(J), and 2 levels based on the number of victims, § 2B1.1(b)(2)(A), and a 3 level deduction for acceptance of responsibility, § 3E1.1, for a final level of 23. Because defendant had no prior record, he fell in criminal history category of I. Matching level 23 and category I on the sentencing table produced an imprisonment range of 46-57 months.

---

[1] The parties agreed that this loss figure included any credit to which defendant was entitled under U.S.S.G. § 2B1.1 cmt. n.3(E).

## II.  SECTION 3553(a)

**A.     Sentencing Factors**

Section 3553(a) provides that the court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

After considering these factors, the court must comply with the statute's "overarching command" to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  Kimbrough v. United States, 552 U.S. 85, 101 (2007).  While the guidelines serve as the starting point and initial benchmark in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009).  Rather, after accurately calculating the advisory range so that it can derive

whatever insight the guidelines have to offer, the district court must make an independent determination based on all of the § 3553(a) factors and "without any thumb on the scale favoring a guideline sentence." United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

**B.    Analysis**

Defendant's prosecution arose out of his involvement in a mortgage fraud scheme concocted by his co-defendant, Paul Zaleski. Beginning in late 2004, Zaleski, a mortgage broker, devised a plan to acquire, remodel, and sell residential properties. Because neither Zaleski or his partner, Michael Pembroke, had the resources to make necessary payments on the properties they targeted for purchase, Zaleski devised a scheme to generate funds. The scheme involved creating "seller's credits" derived from loan proceeds, which were deposited into the bank account of Silver Creek Investments, a shell company Zaleski and Prembroke created.

To create the credits, Zaleski targeted so-called "motivated sellers" – people whose properties had been on the market for awhile – and offered them more than their asking price, with the condition that the difference between the asking price and the actual contract price be remitted to Silver Creek. The sellers were told that the credits were going to be used by the buyers to improve the properties. While the seller's credits were generally memorialized in an addendum to the sales contract, they were not included in the loan applications Zaleski forwarded to potential lenders. As a result, lenders were not told that the contract price was not the actual selling price. Zaleski also recruited "investors," who basically acted as straw purchasers for the properties.

To further effectuate the scheme, Zaleski enlisted this defendant, a real estate agent

3

and appraiser. Defendant helped Zaleski and Pembroke locate properties that could be remodeled and resold, and he negotiated the details of the sales contracts including the increased contract price, which would create the seller's credits Zaleski required. Defendant understood that the seller's credits would be disbursed to Silver Creek and later to two other shell companies Zaleski created, Lakeside Property Management and Northpointe Development. Defendant further understood that Zaleski wanted him to appraise the properties at the contract prices rather than the owner's true asking price, even though the asking price more fairly represented the actual value. Between October 2004 and August 2006, defendant helped Zaleski locate and purchase about fifteen properties, and he completed at least thirty-seven appraisals at Zaleski's request, each time valuing the property at the contract price rather than the owner's asking price. For these transactions, he received real estate commissions if he was involved as the realtor and appraisal fees if he was involved as the appraiser. The sales contracts and appraisals then became part of fraudulent loan application packages created by Zaleski and resulted in the funding of loans through interstate wire transactions.

The scheme collapsed in September 2006, due to a combination of decline in the housing market and Zaleski's inability to convince additional buyers to become involved. Zaleski stopped paying the mortgages and told the individual borrowers, who did not think they had any personal obligation, that they were on their own. Few of the properties were resold to bona fide buyers. The majority of the loans went into default and the properties into foreclosure, causing substantial losses to the entities that acquired the mortgage notes and credit issues for the various borrowers solicited as investors in the venture. Defendant received his normal realtor and appraisal fees for the transactions he was involved with, while Zaleski

and Pembroke took money from the sellers' credits. Defendant did not otherwise receive proceeds from the fraud scheme.

Defendant indicated that he realized his actions were stupid and inexcusable, and that his conduct affected others, as the costs of this type of crime are passed on to other innocent people. He offered no excuses other than to say that he let greed get the best of him. Unlike some of the co-defendants, he did not lie to the investigating agents when they first approached him about the scheme, and he was the first defendant to reach a plea agreement with the government.

At age fifty, this was defendant's first experience with the criminal justice system, and his background was otherwise positive. Married for about twenty years, he had a twelve year old son and was by all accounts a good father. He also helped care for his mother, who suffered from dementia. He appeared to be in good physical health, after a previous bout with cancer, with no mental health or substance abuse issues, or other correctional treatment needs. He earned a college degree and worked in the real estate field for many years. Due to his involvement in this scheme, he expected to lose his real estate and appraiser's licenses, and planned to move into a different field and perhaps pursue a master's degree.

As noted, the guidelines recommended 46-57 months' imprisonment, and I agreed that some period of confinement was necessary to reflect the seriousness of the offense, promote respect for the law, and deter others. As defendant realized, these types of schemes cause harm not just to lenders but also to the communities in which the affected properties sit. The housing market has suffered enough without the added strain caused by fraud schemes such as this generating more foreclosed properties. The sentence had to be sufficient to recognize

5

this harm and to deter others from engaging in similar conduct.[2]

I did find a term below the range sufficient, however. First, the loss figure somewhat overstated the seriousness of defendant's specific conduct. While a willing appraiser like defendant may be essential to the success of a scheme like this, I wanted to acknowledge that this was Zaleski's scheme, and Zaleski and Pembroke took most of the gain. Defendant received no more than his normal realtor and appraisal fees for the transactions with which he was involved.[3] A below guideline sentence thus sufficed to provide just punishment.

Second, given his age and lack of any prior record, defendant did not pose a threat to the public. Nor was lengthy prison necessary to deter defendant. This process appeared to have had a significant affect on him, and he indicated that he planned to move into a different field in the future.

Under all the circumstances, I found a total period of confinement of one year sufficient but not greater than necessary. I split this sentence into 6 months prison and 6 months home confinement. This sentence provided sufficient punishment and deterrence, while accounting for the mitigating factors discussed.

### III.  CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 6 months. Based on his financial situation and the anticipated restitution, I determined that he lacked the ability to pay a fine and thus waived the fine. The parties agreed to defer the final

---

[2]Defendant noted that co-defendant Patricia Kay received a sentence of probation, but she pleaded guilty to misprision of a felony and cooperated with the government and thus was not comparable to defendant.

[3]Defendant nevertheless faced what was likely to be a huge, joint and several restitution obligation.

determination of restitution for 90 days pursuant to 18 U.S.C. § 3664(c)(5). Upon release from prison, I ordered defendant to serve a supervised release term of 3 years. I selected the maximum term primarily to facilitate payment of restitution. As conditions, I required defendant to make regular restitution payments and comply with the conditions of home confinement for a period not to exceed 180 consecutive days. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 30th day of June, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge